## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MEDPRICER.COM, INC., | No. 3:13-cv-1545 (MPS) |
| Plaintiff, | |
| v. | |
| BECTON, DIXON AND COMPANY, | |
| Defendant. | |

## MEMORANDUM OF DECISION

### I.    INTRODUCTION

This action arises out of a contract dispute between MedPricer.com, Inc. ("MedPricer"), a company that operates an online portal through which purchasers and suppliers of medical equipment can make and accept bids, and Becton, Dixon, and Company ("Becton"), a company that provides medical products, including safety needles and syringes.  MedPricer brought suit for, *inter alia*, breach of contract, and Becton responded by alleging as an affirmative defense that the contract violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a–7b(b). The parties have filed cross-motions for summary judgment.  For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED without prejudice in part, and Plaintiff's Motion for Summary Judgment is DENIED without prejudice.

### II.    FACTS

The following facts are taken from the parties' Local Rule 56(a) Statements and the documents cited therein. *See* Defendant's Local Rule 56(a)(1) Statement, ECF No. 68; Plaintiffs' Local Rule 56(a)(2) Statement, ECF No. 81-2; Plaintiffs' Local Rule 56(a)(1) Statement, ECF

No. 70-4; Defendant's Local Rule 56(a)(2) Statement, ECF No. 80-2.  The facts are undisputed unless otherwise noted.

MedPricer operates a website that provides an online auction platform allowing buyers and sellers to conduct online negotiations ("Sourcing Events"), which include online requests for quotes ("RFQs"), i.e., the means to enter bids to supply services or products to health care organizations.[1]  (Defendant's Local Rule 56(a)(1) Statement ("Def.'s L.R. 56(a)(1) Stmt."), ECF No. 68 at ¶ 1-2; Plaintiffs' Local Rule 56(a)(2) Statement ("Pl.'s L.R. 56(a)(2) Stmt."), ECF No. 81-2 at ¶ 1-2.)  MedPricer does not participate in the Sourcing Events directly, but facilitates negotiations between buyers and suppliers through its website.  (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 4; "Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 4.)

Hospitals and other healthcare service providers enter into Service Agreements with MedPricer to engage MedPricer as the exclusive provider of e-sourcing services.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 10; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 10.)  Under the Service Agreement, MedPricer has no role in determining which suppliers are invited to participate in the Sourcing Event and which are ultimately awarded business from the Sourcing Event.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 8; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 8.)  Rather, the hospitals determine which suppliers to invite to a Sourcing Event and MedPricer then sends invitations to those suppliers.  (Plaintiffs' Local Rule 56(a)(1) Statement ("Pl.'s L.R. 56(a)(1) Stmt."), ECF No. 70-4 at ¶ 8; Defendant's Local Rule 56(a)(2) Statement ("Def.'s L.R. 56(a)(2) Stmt."), ECF No. 80-2 at ¶ 8.)  MedPricer provides the online forum for

---

[1] The parties use the term "Sourcing Event" to describe all negotiations on the MedPricer platform, including RFQs.  The terms and conditions of the Contract describe a Sourcing Event as "other negotiations."  (ECF No. 69-3 at 2.)  For the sake of clarity, I will use the term "Sourcing Event" to describe all of the transactions at issue in this case.

the Sourcing Events, provides the forms on which the bids are made, and offers to answer questions about the bidding process.  (ECF No. 69-6 at 10.)

　　　Once a supplier is invited to a Sourcing Event, it must visit MedPricer's website, create an individual login, password, and member profile, and register as a supplier to participate in Sourcing Events and view specifications for a bid.[2]  (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 6; Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 6.)  As part of the required registration process, the supplier must click a box indicating acceptance of an agreement with MedPricer (the "Contract").  (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 7; Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 7.)  Before accepting the Contract, a supplier has the opportunity to review the terms and conditions of the Contract.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 13; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 13.)  After the supplier has registered, MedPricer emails the supplier with a copy of the Contract.  (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 8; Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 8.)

　　　The Contract states that a fee of 1.5% of the value of the transaction shall be paid by a supplier "who participates in a Sourcing Event through MedPricer and is awarded business related to a Sourcing Event."  (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 10; Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 10.)  The fee is volume based, rather than a flat fee.  (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 13, 11; Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 13, 11.)  Even if the sale is completed after the Sourcing Event, or is concluded between the buyer and

---

[2] The parties disagree about whether the "only way" for a supplier to sell the listed products specified by the participating healthcare facility in the Sourcing Event to that facility is through MedPricer's online auction platform.  (Def.'s L.R. 56(a)1 Stmt., ECF No. 68 at ¶ 5; "Pl.'s L.R. 56(a)2 Stmt., ECF No. 81-2 at ¶ 5.)  While the evidence Becton cites does not support this statement, the invitation to participate in the Barnabas Health Sourcing Event states that "[v]endors that decline to participate in the online RFQ will not be allowed to bid in any other manner."  (Def.'s Ex. G, ECF No. 69-7 at 4.)

supplier on different terms than those set forth in the Sourcing Event, the supplier must still pay MedPricer the 1.5% fee. (Def.'s L.R. 56(a)(1) Stmt., ECF No. 68 at ¶ 14; Pl.'s L.R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 14.) The Contract also includes a term binding the supplier to any bid that it makes during a Sourcing Event. (ECF No. 69-3 at 7 ("A supplier may withdraw any bid during the course of the Sourcing Event. Any bids that are not withdrawn will be considered contractually binding.").) The Contract requires that winning suppliers provide MedPricer with monthly sales reports and payments for all business transacted as a result of the successful bid. (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 39; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 39.)

Becton participated in three transactions on the MedPricer platform that are the subject of this lawsuit.[3] On October 3, 2011, Becton accessed the MedPricer platform to participate in a Sourcing Event for Children's Hospital of Alabama (the "First Transaction"). (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 15; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 15.) Becton checked the box indicating that it accepted the terms of the Contract and was provided access to the Sourcing Event.[4] (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 15; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 15.) On October 25, 2011, Becton participated in a Sourcing Event for Children's Hospital and submitted a bid to provide analyzers. (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 17-18; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 17-18.) Following the Sourcing Event, Becton was awarded the Children's Hospital business. (Pl.'s L.R. 56(a)(1)

---

[3] Becton participated in previous Sourcing Events using the MedPricer platform and paid the fees associated with those Sourcing Events prior to the transactions at issue in this case. (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 14; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 14.)

[4] Becton disputes that checking the box indicates that it accepted the terms of the Contract. As discussed below, I need not reach the question because the Contract violates the AKS.

Stmt., ECF No. 70-4 at ¶ 19; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 19.)  Becton sold the

analyzers to Children's Hospital for $28,900.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 20;

Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 20.)  Under the Contract, MedPricer was entitled

to 1.5% of the total volume of the sale, or $433.50.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶

21-22; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 21-22.)  MedPricer invoiced Becton for the

fee, but Becton did not pay it.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 22; Def.'s L.R.

56(a)(2) Stmt., ECF No. 80-2 at ¶ 23.)

On May 21, 2012, Becton was invited to participate in Sourcing Events for Barnabas

Health (the "Second Transaction" and "Third Transaction").  (Pl.'s L.R. 56(a)(1) Stmt., ECF No.

70-4 at ¶ 23; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 23.)  Becton accessed the MedPricer

platform and was required to register again.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 24;

Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 24.)  Becton registered by checking the box

indicating acceptance of the Contract.[5]  (*Id.*)  Becton then contacted MedPricer and requested

that it be permitted to make payments on a semi-annual rather than monthly basis as required by

the Contract, and MedPricer agreed to allow payment semi-annually.  (Pl.'s L.R. 56(a)(1) Stmt.,

ECF No. 70-4 at ¶ 27-28; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 27-28.)  MedPricer

allowed Becton access to its platform and Becton participated in a Sourcing Event and submitted

bids to provide pre-filled syringes and safety syringes to Barnabas.  (Pl.'s L.R. 56(a)(1) Stmt.,

ECF No. 70-4 at ¶ 30-32; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 30-32.)  In submitting

the bids, Becton included a comment stating:

---

[5] While the parties indicate that the Contract changed in the time between the Children's
Hospital and Barnabas transactions, they have provided only the version of the Contract related
to the Barnabas transactions.  They also have not indicated that the versions of the Contract
differed in any material way.  As such, I will refer to the Contract as the operative agreement for
all three transactions.

> [Becton]'s response to this Request for Quote and the pricing offered herein is subject to the understanding that [Becton] will not be required to pay any fees to MedAssets or any other GPO fee.  The MedPricer fee is subject to continued discussion.  In the event that [Becton] is required to pay any such fees, [Becton] reserves the right to modify the pricing offered herein.

(Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 33; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 33.)  Following the bids, Becton and Barnabas reached an agreement for Becton to sell Barnabas pre-filled syringes (the Second Transaction) and safety syringes (the Third Transaction) for a certain price for three years.  (Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 36; Def.'s L.R. 56(a)(2) Stmt., ECF No. 80-2 at ¶ 36.)  Becton did not provide MedPricer with monthly sales reports or pay any fees to MedPricer as a result of the Second and Third Transactions.  This action followed.

In its Amended Complaint, MedPricer brings four claims against Becton for the failure to pay the fees associated with the First, Second, and Third transactions.  The claims include Breach of Contract (Count One), Breach of the Covenant of Good Faith and Fair Dealing (Count Two), Unjust Enrichment (Count Three), and Violation of Connecticut Unfair Trade Practices Act ("CUTPA") (Count Four).  MedPricer has moved for summary judgment on Count One, and Becton has moved for summary judgment on all counts.

### III.   LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of

6

evidence to support an essential element of the nonmoving party's claim." *Id.* If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

An issue of fact is "material" if "it might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000) (internal citation and quotation marks omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal citation and quotation marks omitted). On summary judgment, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (internal citation and quotation marks omitted). In this case, both parties have moved for summary judgment.

## IV.    DISCUSSION

I begin with Becton's Motion for Summary Judgment because I need not decide the legal issues raised by MedPricer's Motion for Summary Judgment if the Contract is unenforceable.[6] Becton argues that the Contract is unenforceable because it violates the AKS, 42 U.S.C. § 1320a–7b(b).  Both parties agree that Connecticut law governs the Contract.  Under Connecticut law, illegal contracts are unenforceable.  *D'Angelo Dev. & Const. Co. v. Cordovano*, 278 Conn. 237, 242 (2006).  "The question of whether a contract is enforceable or illegal is a question to be

---

[6] I also need not decide any other issues raised by Becton's Motion for Summary Judgment as to all four counts of the Complaint.  MedPricer does not argue that any of those claims would survive a finding that the Contract is illegal.

determined from all the facts and circumstances of each case. Similarly the question of whether a contract is against public policy is a question of law dependent on the circumstances of the particular case." *Carriage House I-Enfield Ass'n, Inc. v. Johnston*, 160 Conn. App. 226, 245–46 (2015) (internal quotation marks omitted). "Generally, a contract made in violation of a statute is illegal and unenforceable." *Cimmino v. Town of Trumbull*, 1994 WL 76859, at *2 (Conn. Super. Ct. 1994) (*quoting* C.J.S., supra, § 201) (holding that a contract was unenforceable where it violated a state law intended to prevent conflicts of interest because "[e]ven assuming the alleged contract was entered into with the best of intentions it is still in violation of [the statute]."). "The court will not lend its aid in support of a contract rendered in violation of a governing statute." *Douglas v. Smulski*, 20 Conn. Supp. 236, 239, 131 A.2d 225, 226 (Com. Pl. 1957). "[I]t is in order to effectuate an underlying public policy, rather than to sanction a party seeking to enforce an 'illegal' contract, that courts refuse to lend assistance to those who have contributed to the illegality that taints the contract." *Dowling v. Slotnik*, 244 Conn. 781, 808, 712 A.2d 396, 410 (1998).

The AKS states in relevant part that it is illegal to "knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) . . .

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b. Recognizing that "the language of that section is generally very broad," *Feldstein v. Nash Cmty. Health Servs., Inc.,* 51 F. Supp. 2d 673, 681 (E.D.N.C. 1999), Congress authorized the Office of the Inspector General of the United States Department of Health and Human Services ("OIG") to issue advisory opinions and promulgate regulatory safe harbors

under the AKS.  42 U.S.C. § 1320a-7d.  OIG has stated that the AKS "is extremely broad. . . .
[P]rohibited conduct includes not only remuneration intended to induce referrals of patients, but
remuneration also intended to induce the purchasing, leasing, ordering, or arranging for any
good, facility, service, or item paid for by Medicare or State health care programs."  General
Comments, Office of Inspector General, Notice of Final Rule, Anti–Kickback Provisions of
Medicare and State Health Care Programs, 55 Fed.Reg. 35,952 (1991).

Becton argues that the Contract violates the AKS because it involves MedPricer's
receiving "remuneration" for "arranging" the purchasing of goods for which payment may be
made in whole or in part under a Federal health care program, in violation of 42 U.S.C. § 1320a-
7b(b)(1)(B).[7]  For the reasons set forth below, I agree.

The parties agree that the Contract would result in MedPricer receiving remuneration.
But they disagree about whether it satisfies three other elements of the AKS: first, whether
MedPricer "arranges" for the purchase or selling of goods; second, whether the three transactions
at issue in this case implicated a federal health care program; and third, whether MedPricer had
the requisite intent to violate the AKS.

### A.  <u>MedPricer "Arranges" For the Purchase or Selling of Goods</u>

The AKS does not define the term "arranging," and I could find no reported cases
explicating this provision of the statute.  "Where Congress provides no definition for a term in a
statute, [a court] consider[s] the ordinary, common-sense meaning of the words."  *United States
v. DiCristina,* 726 F.3d 92, 97 (2d Cir. 2013) (citations and internal quotation marks omitted).
The parties agree that the ordinary meaning of arrange is "to make preparations for: plan[;] . . . to

---

[7] Becton's briefs are unclear about which prong of the AKS the Contract violates.  At oral
argument, Becton clarified that the prong at issue was 42 U.S.C. § 1320a-7b(b)(1)(B).

bring about an agreement or understanding concerning." Merriam-Webster's Collegiate Dictionary 64.  The parties also point to the same Supreme Court case – *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 609–10 (2009) – which analyzed the use of the term "arrange" in a different statute, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  Using the dictionary definition of "arrange" set forth above, the Supreme Court found that a defendant did not "arrange[] for the disposal . . . of hazardous substances" in violation of CERCLA where it did not "take intentional steps to dispose of hazardous waste," even though it knew that during the process of transferring the hazardous materials some spills could occur.  *Id.* at 611-612.  The Court held that "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product."  *Id.* at 612.

Invoking *Burlington*, MedPricer argues that to be liable for "arranging" a sale in violation of the AKS, it must have intended to sell the products at issue in the three transactions with Becton.  This intent is missing, MedPricer argues, because under the Contract it does not sell at all:  it does not take title to any products, submit any bids, reach any deals, place any orders, or decide which bid wins.  But, of course, "arranging" a purchase or sale is broader than "making" a purchase or sale, and MedPricer can intend to bring about a sale even if it is not a party to the sale.  In fact, MedPricer's business model is premised on making preparations for and bringing about agreements to purchase and sell between suppliers and buyers.  MedPricer itself states that it is a "provider of comprehensive e-sourcing services to the healthcare sector that helps facilitate the negotiation of contracts between the healthcare sector and suppliers," (Pl.'s L. R. 56(a)(1) Statement, ECF No. 70-4 at ¶ 13), and MedPricer conceded at oral argument that this means, in effect, that it "facilitates sales."   It also acknowledges in its brief that its website provides "a

forum where 'an agreement or understanding' may be reached between the health care facility and supplier for the possible sale of products." (MedPricer Opp., ECF No. 81 at 7-8.)  In addition, MedPricer makes money only if a sale occurs; the entire business model would be unsustainable if MedPricer did not intend for sales to occur.  I find that the Contract satisfies the ordinary meaning of "arrange" that the parties agree applies here.  The fact that MedPricer does not choose which particular suppliers participate in the sales and which products are sold does not mean that it does not intend that a sale take place.

MedPricer's description of its business as "essentially organiz[ing] an auction house" for "live auction events" (ECF No. 70-1 at 22-23, Pl.'s L.R. 56(a)(1) Stmt., ECF No. 70-4 at ¶ 34) confirms that it "arranges" sales.  Courts have described the task of an auctioneer as "arrang[ing] the sale" of a product.  *See, e.g., United States v. Chesley's Sales, Inc.*, 523 F. Supp. 528, 529 (W.D. Pa. 1981).  MedPricer's services are akin to those of an auction house.  For example, MedPricer includes a term in the Contract that binds the supplier using its website to its bid. (ECF No. 69-3 at 7 ("A supplier may withdraw any bid during the course of the Sourcing Event. Any bids that are not withdrawn will be considered contractually binding.").)  Such a house rule of engagement for the Sourcing Events is similar to a term an auctioneer might impose on bidders as part of the services it provides to participants in an auction.  MedPricer also provides the forms on which the bids are made and offers to answer any questions during the bidding process – again, much like an auction house would.

The Contract's percentage-based fee likewise points to coverage by the AKS.  The OIG has found that compensation arrangements based on a percentage of sales "appear to be associated with an increased potential for program abuse."  OIG Advisory Opinion No. 99-3,

1999 WL 34984727, at *6 (Mar. 23, 1999).  These types of arrangements are subject to greater

scrutiny, because their inclusion suggests that

> the parties' actions under the Agreement could be motivated by their desire and
> ability to increase sales of . . . products that might be paid for by federal or state
> health care programs. Regardless of which party was to be responsible for the
> marketing of the Zimmer products, the end result would be the same: the more
> products sold, the more money the parties would make.

*Zimmer, Inc. v. Nu Tech Med., Inc.,* 54 F. Supp. 2d 850, 862–63 (N.D. Ind. 1999).  Courts have

held that percentage-based compensation arrangements violate the AKS.  *See Zimmer*, 54 F.

Supp. 2d at 862–63; *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.,* 926 F.

Supp. 835, 844 (E.D. Ark. 1996), *aff'd*, 112 F.3d 513 (8th Cir. 1997).  Perhaps a different

question would arise if MedPricer was not paid on a percentage of the volume of sales, but

charged all suppliers who submitted a bid for the cost of the service.  Then it could argue that the

Contract was not about arranging a sale, but about providing a service.  But the link between

MedPricer's fee and the volume of the sale confirms that it violates the AKS.

MedPricer cites OIG Advisory Opinion No. 08-19, 2008 WL 6067529 at *1 (Oct. 29.

2008), where the OIG determined that it would not take enforcement action against an

arrangement in which an internet advertiser collected zip code information from potential

patients for a chiropractor on a "pay per lead basis."  MedPricer argues that it performs a similar

service.  But the OIG found that the proposed arrangement "could potentially generate prohibited

remuneration under the anti-kickback statute," determining only that it would not take

enforcement action based on other considerations.  *Id.*  The opinion thus does not say that the

arrangement fell outside the AKS.  Furthermore, two of the main reasons that the OIG declined

to take action are not applicable here.  First, the internet advertiser was not affiliated with the

health care industry, which is not true of MedPricer, which is a "provider of comprehensive e-

Sourcing services to the healthcare sector." (ECF No. 70-4 at ¶ 3.) Second, the OIG determined that the fee arrangement was not dependent on whether a lead actually became a patient, i.e., whether a transaction that could be paid for by a federal health care program occurred. The fee was for the lead, not for any transaction that might result from the lead. By contrast, MedPricer's fee is tied to the success of the sale of medical products; it is paid only if a sale is made and its revenue is based on the volume of the sale.

**B.** **Whether the Goods at Issue Are Goods For Which Payment "May Be Made . . . Under a Federal Health Care Program"**

MedPricer also argues that Becton has failed to introduce into the record evidence satisfying the next element, which is that payment for the goods "*may* be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b (emphasis added). The statute defines "Federal health care program" as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government . . .; or (2) any State health care program, as defined in section 1320a-7(h) of this title." *Id.* The statute does not define "may be made," and the parties' arguments revolve around the meaning of this phrase.

Black's Law Dictionary lists two possible definitions of "may": (1) "To be permitted to" and (2) "To be a possibility." (10th ed. 2014).[8] The Fifth Circuit chose the second definition, defining "may" as "could." *United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004) (". . . (4) to another for the furnishing of an item or service that could be paid for by a federal health care program."). The OIG, in many advisory opinions, describes the element as "items or services

---

[8] The Second Circuit has suggested that the ambiguity could be avoided "by using 'might' to mean that something is possible, and reserving 'may' to mean that something is permitted." *Travelers Indem. Co. v. Eitapence*, 924 F.2d 48, 50 (2d Cir. 1991).

reimbursable by a federal health care program," which also seems to align with the second definition of "may." OIG Advisory Opinion No. 13-10, 2013 WL 4777139, at *6 (Aug. 16, 2013). There is very little case law on the subject, and I have been unable to find any substantive discussion of what "may be made" means in this context. That being said, a survey of the OIG Advisory opinions suggests that the "may be made" element is not meant to be a stringent requirement, and that even the presence of a hospital in the transaction is enough to satisfy the requirement. *See, e.g.,* OIG Advisory Opinion No. 13-10, 2013 WL 4777139 at *1 (Aug. 16, 2013).

Congress's inclusion in the AKS of a safe harbor for group purchasing organizations ("GPOs") likewise suggests that the "payment may be made" element is not stringent. The GPO safe harbor exempts from the coverage of the AKS "any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal health care program" if certain conditions are met. 42 U.S.C. § 1320a-7b(b)(3)(C). The inclusion of that exemption suggests that payments by equipment suppliers to a purchasing agent for an entity that provides services for which payment may be made under a federal health care program, such as a hospital, could otherwise violate the AKS. If that is so, then the "payment may be made" requirement must call for only a minimal showing, e.g., that the buyer of the goods provides services to one or more beneficiaries of a federal health care program. OIG Advisory Opinions confirm this reading. In one opinion, the OIG evaluated an arrangement involving "a group purchasing organization that negotiates with vendors of health care products . . . for discounted prices on behalf of contracting health care providers . . . that furnish items and services reimbursable, in whole or in part, by a Federal health care program," and determined that it met the requirements of the GPO safe

14

harbor.  OIG Advisory Opinion No. 01-6, 2001 WL 36190945, at *1 (May 29, 2001).  Although

the OIG found all the safe harbor elements to be satisfied in that case, the implication – and

presumably, the impetus for requesting the opinion in the first place – was that the arrangement

would otherwise have fallen within the AKS.

MedPricer argues that the "payment may be made" element mandates a much greater

showing, and, in particular, that Becton has to show that the goods at issue actually were used on

patients receiving services paid for under a Federal health care program.  Under MedPricer's

reading of the statute, "may" means "must" rather than "might," and suppliers could escape

liability because of the difficulty in tracking whether items such as needles were used in

performing services paid for by a federal health care program.  In the context of a busy hospital,

it would be onerous for the government to prove that a particular item was used by a particular

patient whose care was paid for by a government program (as opposed to a private payor).

Requiring the government to meet such a burden is not in line with the AKS's broad scope or its

purpose of "strengthen[ing] the government's ability to prosecute and punish fraud in the

system."  *Hanlester Network v. Shalala*, 51 F.3d 1390, 1396 (9th Cir. 1995).

MedPricer has admitted that Barnabas (the buyer in the Second and Third Transactions)

"furnishes services for which payment may be made in whole or in part under Medicare,

Medicaid or other federal health care programs." (Def.'s L. R. 56(a)(1) Stmt., ECF No. 68 at ¶

17; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 81-2 at ¶ 17.)   Furthermore, the contract between

MedPricer and Barnabas explicitly states that Barnabas provides services which may be paid for

by a federal health care program.  (ECF No. 69-2 at 2.)  As I read the statute, that is enough to

satisfy the element that the goods "may" be paid for under a federal health care program.  Becton

sold the items to a hospital that provides services reimbursable under a federal health care

program, and the items could be used in performing those services.  Thus, they are items "for which payment may be made in whole or in part under a Federal health care program."

MedPricer points out that syringes are typically not separately reimbursable by a federal health care program and that hospitals are reimbursed for providing a service, not for the equipment included in doing so.  As shown, however, this does not foreclose a showing that "payment may be made" under a federal health care program.  To be sure, the OIG considers this distinction in determining whether to take enforcement action, but it does not do so in determining whether the arrangement falls within the broad language of the AKS.  *See* OIG Advisory Opinion 13-10, 2013 WL 4777139, at *1 (Aug. 16, 2013) (where the OIG determined that the arrangement could potentially generate prohibited remuneration under the AKS, but declined to take enforcement action, in part because the services were not separately reimbursable by a federal health care program and thus the arrangement was unlikely to increase costs); OIG Advisory Opinion No. 98-10, 1998 WL 35287765, at *1 (Sept. 8, 1998) (same).[9] The OIG has opined that items that are not separately reimbursable are unlikely to increase costs to the federal health care system because they represent an expense to the hospital that must be covered by a fixed payment determined in advance by the Secretary of Health and Human Services.[10]  *See id.*  In making this determination, however, the OIG has never found that such

---

[9] At oral argument, MedPricer's counsel stated that MedPricer had chosen not to seek an advisory opinion from the OIG concerning the Contract.

[10] Congress established the "Prospective Payment System" ("PPS") in 1983, which "marked a major departure in Medicare reimbursement policy."  *Huntington Hosp. v. Thompson*, 319 F.3d 74, 76 (2d Cir. 2003).  The PPS "established a number of Diagnostically Related Groups ('DRGs'), which describe particular classes of patients and treatments, and the amount Medicare will pay for each. DRG cost schedules are generated from anticipated national and regional average costs for the treatment of particular illnesses."  *Id.* (*citing* 42 U.S.C. § 1395ww(d)(2)(D) (2000)).  Because DRG payments are focused on average costs, they do take into account the "cost to any particular hospital of treating particular DRG-classified illnesses," meaning that if

items are not those for which payment may be made under a federal health care program.  It has simply said that the arrangements involving such items do not pose a significant risk of abuse, and thus it would not take enforcement action.  I conclude that with respect to the Second and Third Transactions relating to Barnabas, Becton has satisfied the minimal requirement of showing that the Contract involved the sale of items for which payment may be made under a federal health care program.

As to the transaction with Children's Hospital of Alabama, however, Becton has not satisfied this element.  While the parties submitted the contract between Barnabas and MedPricer, no such contract was submitted into the record for Children's.  Even though I have found that this element requires only a minimal showing, Becton has not even attempted to meet its burden with respect to the Children's Hospital transaction.  Therefore, it is not entitled to summary judgment as to the First Transaction.

**C.**   **Becton is Not Required to Establish that MedPricer "Knowingly and Willfully" Solicited Remuneration**

MedPricer also argues that Becton has failed to establish the intent element mandated by the AKS, namely, that a defendant "knowingly and willfully" solicit remuneration.  MedPricer argues that summary judgment is inappropriate where issues of fact remain as to MedPricer's intent.  However in this instance, I am not holding anyone criminally liable for a violation of the statute; rather, I am determining whether the Contract itself is contrary to public policy and illegal.  As the Connecticut Supreme Court has held, holding a contract illegal is about "effectuat[ing] an underlying public policy, rather than sanction[ing] a party."  *Dowling v.*

---

the hospital's costs are greater than the DRG prescribes, the hospital must absorb the difference. *Id.*

17

*Slotnik*, 244 Conn. 781, 808, 712 A.2d 396, 410 (1998).  Courts in Connecticut have found

contracts illegal when they violate a statute "[e]ven assuming the alleged contract was entered

into with the best of intentions."  *Cimmino v. Town of Trumbull*, 1994 WL 76859, at *2 (Conn.

Super. Ct. 1994).  The U.S. Supreme Court has agreed with this idea.  In holding that a contract

violated a different anti-kickback statute applicable in the defense procurement context, the

Supreme Court noted "the inherent difficulty in detecting corruption which requires that

contracts made in violation of (the Anti-Kickback Act) be held unenforceable, even though the

party seeking enforcement ostensibly appears entirely innocent."  *United States v. Acme Process*

*Equip. Co.,* 385 U.S. 138, 147–48, 87 S. Ct. 350, 356, 17 L. Ed. 2d 249 (1966) (internal

quotation marks omitted).

   Furthermore, other courts have held that the scienter element need not be present to find

that a contract violates the AKS.  *Nursing Home Consultants, Inc. v. Quantum Health Servs.,*

*Inc.,* 926 F. Supp. 835, 843 (E.D. Ark. 1996), *aff'd*, 112 F.3d 513 (8th Cir. 1997) ("While it

might be true that the Court, at this point, could not say that anyone is criminally liable, the fact

remains that the subject matter of the Marketing Agreement is contrary to the public policy of the

United States, as reflected in [the AKS].  As such, the Marketing Agreement itself is illegal, and

hence unenforceable, irrespective of whether anyone can be prosecuted criminally (or civilly) in

connection with that agreement."); *Modern Med. Labs., Inc. v. Smith-Kline Beecham Clinical*

*Labs., Inc.,* 1994 WL 449281, at *4 (N.D. Ill. Aug. 17, 1994) ("For the reasons just discussed,

we conclude that the Agreement had all of the elements of being violative of the Act, except the

scienter element may or may not have been present. However, performance of the contract after

this ruling would definitely constitute a knowing and willful violation and thus, future

performance would be illegal.").  Furthermore, I note that the OIG has commented that "many

marketing and advertising activities may involve at least technical violations of the statute. We,

of course, recognize that many of these ... activities do not warrant prosecution."  Office of

Inspector General, Department of Health and Human Services, *Notice of Final Rule,* 56 Fed.Reg.

35952, 35954 (1991).  I agree with these courts and find that it is not necessary for the Becton to

establish the scienter element to be entitled to summary judgment.

### D.  <u>The Contract Does Not Fit Squarely Within A Safe Harbor</u>

As noted, Congress included in the AKS exemptions for certain conduct in statutory "safe

harbors" and a provision authorizing the Secretary of HHS (through OIG) to promulgate

additional regulatory safe harbors.  42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952.

MedPricer concedes that it does not fit into any of these safe harbors, but attempts to argue that

the Contract warrants exemption because it serves the same purposes and is substantially similar

to many of the arrangements exempted by the safe harbors.

"To receive protection, a business arrangement must fit squarely within a safe harbor;

substantial compliance is not enough, although compliance is voluntary and failure to comply is

not a per se violation of the statute." *U.S. ex rel. Westmoreland v. Amgen, Inc.,* 812 F. Supp. 2d

39, 47 (D. Mass. 2011) (*citing* OIG Compliance Program for Pharmaceutical Manufacturers, 68

Fed.Reg. 23731, 23734 (May 5, 2003)).  MedPricer argues that I cannot find the Contract illegal

just because it does not fall within a safe harbor, a proposition of which there is no doubt.

However, MedPricer cites no authority for the proposition that conduct that clearly violates the

AKS can be saved by "substantial compliance" with a safe harbor; in fact, the OIG has said

exactly the opposite.  Here, the Contract is illegal based on the plain language of the AKS.  If the

arrangement does not "fit squarely" within the safe harbor, then MedPricer cannot claim an

exemption.  The Contract's "coming close" or substantially complying with the safe harbors does not save it from a finding of illegality.[11]

### V.     CONCLUSION

Defendant's Motion for Summary Judgment is GRANTED in part and DENIED without prejudice in part.  The arrangement as to Barnabas violates the AKS, and thus is unenforceable. Becton has not proven that the arrangement as to Children's Hospital of Alabama violates the AKS, because there is not enough evidence in the record to prove that Children's Hospital provides services for which payment may be made under a federal health care program.

While Becton has not shown that it is entitled to summary judgment as to Children's Hospital of Alabama, it may yet be able to do so, because, as shown, the required showing is minimal.  Under these circumstances, I DENY without prejudice MedPricer's Motion for Summary Judgment on the breach of contract claim (Count One) as to the Children's Hospital transaction, even though Becton concedes that it has no other defense to liability as to that transaction.  Granting MedPricer's motion would create a risk of inconsistent judgments, because, at trial, Becton could still prove that the Children's Hospital transaction was illegal and thereby could win judgment in its favor as to the good faith and fair dealing, unjust enrichment, and CUTPA claims.[12]  I therefore DENY both motions for summary judgment as to the

---

[11] The parties' arguments about the safe harbors focus on whether the online auction facilitated by MedPricer raises or lowers the price of the goods sold.  MedPricer argues that the Sourcing Events lower the price because of increased competition, while Becton argues that the Sourcing Events increase the price, because suppliers, forced to agree to the 1.5% fee, pass the cost along to hospitals by charging more than they otherwise would.  The record does not definitively resolve this dispute, but it is not material to whether the Contract violates the AKS.  I note that this debate involves the type of policy considerations the OIG is uniquely suited to address through the advisory opinion process, which MedPricer chose not to utilize.  *See* Note 9, *supra*.

[12] *Compare Nautilus Ins. Co. v. Watson*, 2012 WL 4097731, at *1 (D. Conn. Sept. 10, 2012) ("[F]ederal courts, recognizing the potential for inconsistent judgments, have . . . declined to

Children's Hospital transaction without prejudice.  Within 14 days, Becton shall submit any

supplemental evidence into the record related solely to the question of whether Children's

Hospital of Alabama provides services for which payment may be made under a federal health

care program.  MedPricer will then have 7 days to respond to Becton's filing.  I will treat these

filings as renewals of the remainder of the summary judgment motions and will proceed to rule

on them.  If no filings are made, I will treat the motions as renewed and rule on them on the

existing record.

     IT IS SO ORDERED.

                    ____/s/_____
                    Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
             March 6, 2017

---

grant a default judgment against one defendant until the matter has been adjudicated against
them all.").